UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISON

| | | |
|---|---|---|
| MARK BUCHANAN and DALE HOOVER | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 4:16-cv-3429 |
| | § | JURY |
| STERLING CONSTRUCTION | § | |
| COMPANY INCORPORATED, TEXAS | § | |
| STERLING CONSTRUCTION | § | |
| COMPANY, and MILTON SCOTT | | |
| Defendants. | | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiffs Mark Buchanan and Dale Hoover file this Original Complaint against Defendants Sterling Construction Company Incorporated ("Sterling"), Texas Sterling Construction Company ("TSC"), and Milton Scott ("Scott") (collectively, the "Defendants"), and for their cause of action respectfully show the Court as follows:

## I.   INTRODUCTION

1.      By enacting whistleblower protections in the Sarbanes Oxley Act of 2002 ("SOX") and the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), Congress intended to dismantle a corporate culture that discouraged employees from reporting fraudulent behavior internally or to outside authorities.   To accomplish this end, Congress, through these laws, chose to penalize companies, and their officers and directors, from retaliating against employees that sought to root out financial misconduct.

2.       Sterling, TSC, and Scott apparently missed the memo.  Buchanan and Hoover were retaliated against for engaging in the exact activity protected by SOX and Dodd-Frank: most obviously, just three business days prior to their terminations, they refused to certify quarterly financial statements that contained material misrepresentations of TSC's financial condition—misrepresentations that ultimately would be incorporated into the consolidated financials for Sterling and reported to the Securities Exchange Commission ("SEC") and Sterling's shareholders.

3.       Buchanan and Hoover's refusal to sign the certification was no isolated occurrence; instead, the incident was a culmination of months of lodging complaints with Sterling's management about the shabby condition of TSC's financials as well as its lax internal controls—all activities protected by SOX and Dodd-Frank.  Over the course of 2015, it became increasingly evident to Buchanan and Hoover that Sterling was withholding crucial information from shareholders—information which, if disclosed, would have made it harder to secure a credit facility, drawn the ire of shareholders, and, perhaps most damagingly, elicited the displeasure of regulators.  Of course, these are all poor reasons for withholding material information from the market; in fact, these are exactly the reasons why such information should be disclosed, and exactly why SOX and Dodd-Frank protect this activity.  In short, the two men were terminated for one reason, and one reason alone:  they refused to fall in line and enable what they reasonably believed to be serious financial misdeeds at Sterling and TSC.

4.       Because Buchanan and Hoover refused to fall in line, Sterling was left with one "option"—terminate Buchanan and Hoover.  To do so, Chairman Scott and Sterling's Board contrived a reason that cannot survive the slightest scrutiny—approving a $5,000 payment to retain TSC's best construction foreman.  This reason is obviously pretextual:  it violated no

Sterling policy; it was a sound business decision; it was approved by several senior figures at Sterling; no one, other than the foreman, received any personal benefit; the payment was not material; and similar payments were commonplace.  In truth, the purported basis for Buchanan and Hoover's terminations is as transparently bogus as the real reason is transparently obvious—fire the men trying to make the company deal with its problems.

5.      In total, over just a few months, Buchanan and Hoover uncovered over $36 million worth of financial improprieties in Sterling's books.  By the day of their terminations, October 19, 2015, what were 12 accounting irregularities in June 2015 had ballooned to 17, totaling to $36 million.  Due to Buchanan and Hoover's doggedness, a portion of these losses was disclosed to the market, though, of course, that disclosure was untimely.  But, the majority of these losses still has not been communicated to the market:  the company flat-out refused.  And this was just the tip of the iceberg of the problems at Sterling—Buchanan and Hoover had launched additional internal investigations into financial problems that had yet to conclude prior to their terminations.  Unsurprisingly, the investigation's early results were concerning.  In other words, discovery will almost certainly reveal additional undisclosed losses.

6.      The irony in Buchanan and Hoover's ouster is that their decisions and actions were driven with Defendants' best interests in mind.  But Defendants wanted neither fixes to their issues nor disclosure; instead, they wanted their problems swept under the rug.  Accordingly, Buchanan and Hoover were terminated—terminated for activity that the law not only allows them to undertake, but protects, incentivizes, and even mandates they undertake.

## II.   **PARTIES**

7.      Plaintiff Mark Buchanan is a Texas citizen and resident.

8.      Plaintiff Dale Hoover is a Texas citizen and resident.

3

9.      Defendant Sterling Construction Company Incorporated, TSC's parent company, is a Delaware corporation with its principal place of business located at 1800 Hughes Landing Boulevard, Suite 250, The Woodlands, TX 77380.

10.     Defendant Texas Sterling Construction Company is a Delaware corporation with its principal place of business located at 20810 Fernbush Lane, Houston, TX 77073.

11.     Defendant Milton Scott is a Texas citizen and resident.  He resides at 3743 Bellefontaine Street, Houston, Texas 77025.  Scott's business address is 8 East Greenway Plaza, Suite 910, Houston, Texas 77046.

12.     Defendants Sterling and TSC were at all material times companies with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C § 68l) and/or companies required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)).

13.     Defendant Scott is the Chairman of Sterling's Board of Directors and Chair of Sterling's Audit Committee.  Scott is personally subject to SOX's jurisdiction because he is an "officer, employee, contractor, subcontractor, or agent of such a company," described in paragraph 11.  *See* 18 U.S.C. § 1514A(a).  Scott is personally subject to Dodd-Frank because it is co-extensive, if not broader, than SOX.  *See Wadler v. Bio-Rad Laboratories*, 141 F. Supp. 3d 1005, 1023-25 (N.D. Cal. 2015).

14.     Whenever in this Complaint it is alleged that Defendants committed any act or omission, it is meant that the Defendants' officers, directors, vice-principals, agents, servants, or employees committed such act or omission and that at the time such act or omission was committed, it was done with the full authorization, ratification, or approval of Defendants or was

done in the routine normal course and scope of employment of the Defendants' officers, directors, vice-principals, agents, servants, or employees.

## III.    JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331, for violations of Title VII of the Sarbanes-Oxley Act of 2002 (18 U.S.C. § 1514A) ("SOX"), and the anti-retaliation provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") (15 U.S.C. § 78u-6(h)).

16.    This Court has personal jurisdiction over Sterling, TSC, and Scott because the Plaintiffs' claims arise out of the defendants' acts and omissions in Texas.  Both TSC and Sterling have their principal places of business in Texas.  Scott is a citizen and resident of Texas.

17.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2). Under 28 U.S.C. § 1391(b)(1), all three defendants reside in this judicial district, and all the defendants are residents of Texas.  Under 28 U.S.C. § 1391(b)(2), a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this district.

## IV.    FACTUAL BACKGROUND

18.    In September 2014, Buchanan executed an employment agreement and joined TSC as Vice President North Texas.  Buchanan's wealth of experience speaks for itself.  He is a construction management executive with over 35-years' experience in industrial and heavy civil construction operations, predominately with large-scale construction firms operating in the United States.  Twenty of those years were spent in senior executive leadership roles.  Over his career, Buchanan was directly responsible for leadership and management of over $9 billion in

completed state and federal construction contracts.  He has built various areas of expertise, including on topics such as construction management control systems, construction operations, and construction contract administration.

19.     TSC is a heavy civil construction company that specializes in the building and reconstruction of transportation and water infrastructure.  TSC is a wholly-owned subsidiary of Sterling, which is the publicly-traded parent company of five construction subsidiaries (NASDAQ: STRL).  TSC is by far the dominant subsidiary within Sterling's corporate umbrella.

20.     Milton Scott is the Chairman of Sterling's Board of Directors as well as of its Audit Committee.

21.     On February 2, 2015, less than five months into his tenure, Buchanan was promoted to President of TSC by a unanimous vote of Sterling's Board of Directors.

22.     During these initial months, Buchanan uncovered several irregularities in TSC's finances and cost controls.  Concerned, and now TSC's President, Buchanan took it upon himself to right the ship.  This task, though, was much more challenging than Buchanan had initially perceived, not due to the mechanics of fixing these irregularities, but rather due to Sterling's intransigence.

23.     One major issue was that Buchanan was dealing with senior executives that were subverting him.  For example, in early May 2015, Buchanan discovered that TSC's CFO Brady Janes (who purportedly reported to Buchanan) went directly to Sterling CEO Paul Varello and reported inaccurate projections for the second quarter of 2015—TSC's profit margins were grossly overstated.  Janes submitted these laughable figures to Sterling CEO Varello without Buchanan's review, knowledge, or approval.

24.     Another major issue was that TSC's financial condition was much more dire than what had been presented to Buchanan when Sterling persuaded him to come on board.  On May 11, 2015, Grant Thornton, Sterling's outside auditor, declared a material weakness in TSC's internal controls for the first quarter of 2015.  *See* Exhibit 1.  The declaration of a material weakness obviously had a major impact on Sterling and TSC:  now an outside auditor was asserting that there were major problems in TSC's books and records.  Additionally, on a more personal level, Chairman Scott was embarrassed by the material weakness.  Perhaps as a result of this embarrassment, Sterling Chairman Scott became significantly more involved in TSC's operations starting in the summer of 2015, thereby moving outside of the traditional oversight role of the Chairman of the Board.

25.     To Buchanan's eyes, Grant Thornton's declaration of a material weakness at TSC only validated the complaints he had been articulating.  In part as a result, and after months of voicing grievances, Buchanan was permitted to remove TSC CFO Brady Janes.[1]

26.     On June 15, therefore, Buchanan replaced Janes with Dale Hoover—the best man Buchanan knew for the job—as TSC CFO.  Hoover is a proven financial specialist.  Throughout his thirty-eight year career, Hoover has provided financial and operations leadership.  He holds active Certified Public Accountant, Certified Management Accountant, and Corporate Financial Management professional licenses.  To highlight just a few experiences, in October 1995, Hoover joined Tutor-Saliba Corporation, a $300 million civil and building contractor as Controller.  Hoover provided financial leadership while Tutor-Saliba Corporation grew to a $1.5 billion company by 2008.  At that time, Tutor-Saliba merged with Perini, and Hoover was

---

[1] Curiously, after his termination from the position of TSC CFO for poor performance, Janes was brought on by Sterling as its Vice President of Finance—a position that did not exist before Janes was given it, and a position that no longer exists.  Today, Janes is again TSC CFO, the position from which he had been fired and replaced by Hoover.

promoted to CFO-Civil Group at Tutor Perini Corporation, in which position he had financial responsibility for $1 billion to $2 billion in heavy civil construction projects.  Hoover also has had four years of CPA firm experience with national as well as regional CPA firms.

27.     With Hoover on board, the two now set out to vet TSC's books.  Keep in mind, the two men were trying to run a business; they were not hired to be outside auditors.  In other words, their goal was to turn the company profitable, not to uncover and document the extent of TSC's financial irregularities.  Nevertheless, within weeks, Buchanan and Hoover had unearthed 12 irregularities in TSC's financial records, totaling over $12.5 million in losses that were never reported to the market.

28.     Buchanan and Hoover immediately informed Sterling CEO Varello.  Varello, shaken by this evidence, thought a restatement of earnings might be wise, a belief that Hoover and Buchanan endorsed.  In addition, Varello directed Buchanan, Hoover, Sterling Interim CFO Kevan Blair, and TSC Controller Cathleen Crowhurst to meet with Grant Thornton to discuss these financial irregularities.

29.     The purpose of this meeting, according to Varello, was for Buchanan, Hoover, Blair, and Crowhurst to discuss with additional decision makers the 12 irregularities and a possible restatement of earnings.  For unknown reasons, Sterling Chairman Scott directed Sterling Interim CFO Blair not to attend the meeting.  What is clear though is that Sterling management should have been present.

30.     Minutes into this meeting, Grant Thornton alleged fraud and walked out. Buchanan and Hoover were shocked—while TSC's problems were no doubt serious, both, based on what they had seen, believed the problems could still be addressed.  Grant Thornton, evidently, thought otherwise and quickly withdrew all of its field personnel from TSC.

31.     In response to Grant Thornton's allegations of fraud, Chairman Scott hired the law firm of Baker Botts, L.L.P. ("BB"), who, in turn hired PricewaterhouseCoopers ("PWC") to investigate the allegations of fraud advanced by Grant Thornton.

32.     One week later, on August 8, 2015, Grant Thornton returned to Sterling to assist with Sterling's financial reporting for the second quarter of 2015.  Despite their senior positions and integral roles, Buchanan and Hoover were left out of the loop with whatever it was that BB and PWC "investigated."   Neither Buchanan nor Hoover—the two individuals at TSC who understood these problems best—was involved in any strategic discussion in which BB's or PWC's scope was established.

33.     Neither BB nor PWC furnished any memorandum or opinion letter approving TSC's financials.  Moreover, neither presented any detail or documentation to counter the accounting irregularities that Buchanan and Hoover found.  The detail necessary to allow the creation of a reasonable opinion was nonexistent.  For example, Hoover had requested any and all documents supporting the over-reported revenues on five key projects (the five projects whose financials, months later, Buchanan and Hoover refused to certify)—unfortunately, he never received any supporting documentation from Sterling, Grant Thornton, BB, or PWC. Without the relevant information, there was no way to analyze the relevant issues in an informed manner.  Generally Accepted Accounting Principles, good practice, and, simply, common sense demand that, without the support, you do not assume revenues.

34.     To this day, Buchanan and Hoover have no idea what, specifically, BB and PWC examined, reviewed, or determined.  And what little Buchanan and Hoover did hear through the grapevine was not promising.  For example, PWC told Hoover that it had uncovered cost

irregularities that merited further investigation, but, because of how cabined PWC's investigatory scope was, the real issues could be neither analyzed nor addressed.

35.     What is clear is that these third-parties' presumed approval did not magically make a single underlying problem disappear.  And the sheer number of problems continued to grow.  In August 2015, Buchanan and Hoover increased number of financial irregularities from 12 to 14.

36.     Around this same time, Buchanan and Hoover, to their dismay, learned that a restatement of earnings was off the table.  And the motivation became clear, too—Sterling was negotiating a new line of credit, and a restatement of earnings would jeopardize those efforts.  To Buchanan and Hoover, this decision, like many of Sterling's, prioritized short-term gain at the risk of long-term failure.

37.     In late August 2015, Hoover and Buchanan met with Sterling Interim CFO Blair and Sterling CEO Varello to discuss the financial issues they were continuing to encounter.  Buchanan and Hoover were frustrated with Sterling's response to this meeting.  There was no way around the fact that the commands coming down to Buchanan and Hoover were dubious.  Frankly put, Buchanan and Hoover were asked to manipulate profits, costs, revenues, and contract amounts.

38.     To their credit, the two men pushed back, refusing to be patsies.  In one example, Buchanan and Hoover expressly communicated the serious problems with Sterling's accounting directives via email to Sterling's leadership, including directly to Chairman Scott.

39.     As a result of the constant prodding, on September 14, Sterling Chairman Scott announced the hiring of Ron Ballschmeide to review accounting, projection, and reporting processes.  It was made clear to Buchanan and Hoover that Ballschmeide reported exclusively

and solely to Sterling's Audit Committee, i.e., Chairman Scott.  Around this same time, Hoover discovered additional financial irregularities in TSC's books—the number of irregularities increased from 14 to 17.

40.      No objective party could doubt the excellent work Buchanan and Hoover were doing.  In fact, in a memo dated October 12, 2015, Sirius Solutions, Sterling's internal auditor, was very complimentary of the financial controls that Buchanan and Hoover had implemented.  According to Sirius Solutions, though there were still serious issues, Buchanan and Hoover were getting TSC back on track.  In spite of this praise, Buchanan and Hoover were stonewalled by Sterling at every turn; shockingly, there was no appetite to do what was right in Sterling's camp.  The more Buchanan and Hoover raised concerns and attempted to correct problems in TSC's books, the more they were targeted and interfered with by Sterling and Chairman Scott.

41.      During the same week that Sirius Solutions issued the memo praising Buchanan and Hoover's work, Sterling directed each of its five subsidiaries to execute a quarterly financial statement certification for the third quarter of 2015.  The third quarter ended on September 30, and, normally, company 10-Qs are provided to the market shortly thereafter.  These certifications are a crucial component in the 10-Q process.

42.       One component of quarterly financial certification was reviewing all Works in Progress ("WIP") and certifying that all financial reporting with respect to projects in the WIP was accurate.  At the time of Hoover and Buchanan's terminations, TSC had 81 projects in the WIP, and Buchanan and Hoover were comfortable certifying the financials for 76 of those 81 projects.  For the outstanding five projects, however, Buchanan and Hoover could not in good conscience represent that they were accurate.  Accordingly, they returned the unsigned certification form to Sterling with their solution on how to address their concerns:  the five

problematic projects would be excised from the certification and some new, clarifying language would be included. *See* Exhibit 2 at ¶¶ 1, 2, and 6.

43.     On October 19, 2015, just three business days after submitting the unsigned certification form attached as Exhibit 2, Buchanan and Hoover were terminated.

44.     Needless to say, Buchanan and Hoover were totally blindsided by their terminations.    Neither had ever been disciplined prior to this incident, and neither were aware of any reason why they could be terminated.    The reason given by Sterling for their terminations was a $5,000 payment made by TSC to its best construction foreman who planned to leave for a competitor.    As a basis for terminating Buchanan and Hoover, this reason is preposterous, for the following non-exhaustive list of reasons:

1.  Providing a bonus (or an advance against a bonus to be paid and documented later in the year) to a high-performing foreman does not violate any Sterling policy;

2.  Sterling's Chief Compliance Officer, Craig Allen (who drafted all of Sterling's reimbursement policies) previously approved a similar expense reimbursement;

3.  Several key figures, other than Buchanan or Hoover, at both Sterling and TSC, either before or after the fact, approved the $5,000 payment yet were not terminated;

4.  Buchanan and Hoover were able to retain a prized foreman from a competitor;

5.  Neither Buchanan nor Hoover received any benefit from the transaction;

6.  Buchanan and Hoover were the only people involved in the $5,000 transaction that were terminated.  Phil Anzaldo, whose name is on the expense reimbursement, was offered a promotion just three months later;

7.  There was nothing material about a $5,000 payment advance, especially in light of the fact that Buchanan and Hoover were bringing to light financial improprieties well into the millions. Yet, Chairman Scott was apparently more concerned about this payment than he was about the millions in GAAP irregularities and problems with TSC's financial accounting;

8.  Hoover had absolutely nothing to do with the $5,000 payment;

9.  Later, additional facts would become apparent that cast further doubt on Sterling's motives. For example, the "investigation" done by Sirius Solutions[2] of the $5,000 payment did not include interviewing several other people involved.  Sterling stopped

---

[2] That Sirius Solutions conducted this "investigation" is also telling.  The improprieties discovered by Buchanan and Hoover occurred under Sirius Solutions's watch; in other words, Sirius Solutions was an interested party.

Sirius from investigating other expense reimbursements of senior executives in Sterling companies. Also, Hoover applied for unemployment (Buchanan did not). The Texas Workforce Commission, after evaluating the facts relevant to Hoover's termination, ruled that Hoover's termination was not for cause. Sterling did not appeal.

45.     Another curious aspect of the termination was that Sterling CEO Varello was out of the country for two weeks prior to Buchanan and Hoover's termination. Varello is the individual that Buchanan reported to and the individual in charge of Sterling's operations. Given the timing and circumstances surrounding their terminations, it must have come from Sterling's Board of Directors—in sum, there is little doubt that Chairman Scott had a heavy hand in the decision to terminate Buchanan and Hoover.

46.     It could not have been Buchanan's performance that led to his termination; his performance was unequivocally outstanding, including, without limitation, the following accomplishments: securing profits for TSC in the third quarter of 2015; obtaining millions in earnings in excess of costs (earnings in excess of costs for the first time in years); receiving a unanimous vote by the Board of Directors promoting him to President within months of joining the company; making major improvements to project projections, control systems, and accounting mechanisms; and achieving major improvements in operational performance.

47.     Hoover's performance was similarly outstanding, including, without limitation, the following accomplishments: fixing and improving the accounts payable and disbursements function; identifying and fixing significant errors in the general ledger including cost of construction, receivable and inventory accounts; identifying misreported losses on five jobs; ensuring that the Viewpoint ERP system subcontractor contracts and change orders agreed with an actual executed contract or change order; earning stock awards due to performance exceeding

expectations; making major improvements to project projections, control systems, and accounting procedures; and achieving major improvements in staff performance.

48.     In short, Sterling cannot show that it would have terminated Buchanan or Hoover in the absence of the protected activity; both were exemplary employees.

49.     On April 15, 2016, Buchanan and Hoover filed complaints before the Secretary of Labor under SOX alleging that they were wrongfully terminated for reporting financial irregularities to Sterling's management.   They alleged they were terminated for protected whistleblowing activities relating to the potential fraud perpetrated on the shareholders of Sterling by its management.

## V.     CAUSE OF ACTION

### COUNT I – SOX WHISTELBLOWER RETALIATION

### AGAINST STERLING, TSC, AND SCOTT

50.     Each and every allegation contained in the foregoing paragraphs is realleged as if fully rewritten herein.

51.     Buchanan and Hoover were employees of TSC, whose financials are rolled up into its parent-company, Sterling, a publicly-traded company subject to the provisions of section 12 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78l and/or section 15(d) of said Act (15 U.S.C. § 78o (d)).

52.     Buchanan and Hoover provided information to their supervisors and/or assisted in an investigation regarding conduct which they reasonably believed constituted violations of 18 U.S.C. §§ 1341, 1343, 1344, or 1348, or a rule or regulation of the Securities and Exchange Commission, alone, or in concert with other factors, tended to affected their discharge by the

Defendants.  The Defendants' termination of Buchanan and Hoover also constituted a wrongful retaliatory discharge in violation of 18 U.S.C. § 1514A.

53.     Plaintiffs provided information, caused information to be provided, or otherwise assisted in an investigation regarding conduct which Plaintiffs reasonably believed constituted a violation of 18 U.S.C. §§ 1341, 1343, 1344 or 1348, or a rule or regulation of the Securities and Exchange Commission, when they provided said information concerning accounting irregularities to their supervisors.

54.     Sterling Chairman Scott is individually liable for his participation in the retaliatory termination decision under 18 U.S.C. § 1514A as an "officer, employee, contractor, subcontractor, or agent" of Sterling.  *See Wadler v. Bio-Rad Laboratories, Inc.*, No. 15-CV-0356-JCS, 2015 WL 6438670 (N.D. Cal. October 23, 2015); *See* 76 Fed. Reg. 68084-01, 2011 WL 519070 at 68086 (Nov. 3, 2011) (Interim Final Rule).

55.     SOX's anti-retaliation provision expressly protects employees who report violations internally to supervisors or to other company representatives. 18 U.S.C. § 1514A(a)(1)(C) (protecting those who report to "a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct)").  Here, Buchanan and Hoover reported financial and regulatory compliance irregularities to Sterling management and refused to certify financials because they believed that certifying them would be a violation of federal laws, rules, and regulations.  Moreover, they reasonably believed that Sterling was in violation of federal laws, rules, and regulations—facts they raised with Sterling's management.  As a result, they engaged in activity protected by SOX.

56.     Sterling knew of Buchanan and Hoover's protected activity, and Buchanan and Hoover suffered an unfavorable personnel action because of this protected activity—they were terminated. Sterling Chairman Scott knew of Buchanan and Hoover's protected activity as well and directly participated in the retaliatory termination decision.

57.     The reasons for Plaintiffs' discharge given by Defendants to Plaintiffs and OSHA were and are a pretext for unlawful discriminatory and retaliatory conduct prohibited by SOX—they are nothing but unfounded fabrications with no reasonable basis in fact, and were nothing more than thinly-veiled attempts to remove Plaintiffs for their whistleblowing activities.

58.     SOX's plain language allows for liability where the protected activity is merely a "contributing factor" in the adverse employment decision, which is to say that "any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision" is protected.  *Halliburton, Inc. v. Admin. Review Bd.*, 771 F.3d 254, 263 (5th Cir. 2014); *Lockheed Martin Corp. v. Admin. Review Bd.*, 717 F.3d 1121, 1136 (10th Cir. 2013) (describing the "contributing factor" test as "broad and forgiving"). "[T]he contributing factor standard was intended to overrule existing case law, [case law that required] a whistleblower to prove that his protected conduct was a 'significant,' 'motivating,' 'substantial,' or 'predominant' factor in a personnel action in order to overturn that action."  *In the Matter of Klopfenstein v. PCC Flow Techs. Holdings, Inc.*, ARB 04-149, 2006 WL 3246904 at *13 (U.S. Dep't of Labor SAROX May 31, 2006) (quoting *Marano v. Dep't of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993)).

59.     In addition, "[t]emporal proximity between the protected activity and the adverse action is a significant factor in considering a circumstantial showing of causation."  *Fraser v. Fiduciary Trust Co. Int'l*, 2009 U.S. Dist. LEXIS 75565 at *18 (S.D.N.Y. Aug. 25, 2009)

(citation and internal quotation marks omitted), *aff'd* 396 F. App'x. 734 (2d Cir. 2010)(unpublished); *see also Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 1003 (9th Cir. 2009) ("causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity") (citation and internal quotation marks omitted).

60.     Here, Buchanan and Hoover were terminated just days after refusing to certify TSC's 2015 third quarter financials.  The close temporal proximity must be a significant factor in considering a circumstantial showing of causation, and here it shows that Buchanan and Hoover's protected activity is why they were terminated.

61.     Defendants would not have discharged Plaintiffs had it not been for Plaintiffs' SOX-protected activities.  These SOX-protected activities contributed to Plaintiffs' discharge.

62.     As a direct and proximate result of the acts and omissions of Defendants, Plaintiffs have suffered and will continue to suffer significant lost amounts of base wages, benefits, and bonuses, mental pain and suffering, career advancement, promotions, increases in income, raises in pay, embarrassment, loss of reputation, humiliation, and general damages.

63.     Plaintiffs timely commenced an action before the Secretary of Labor pursuant to 18 U.S.C. § 1514A.

64.     Over 180 days have passed since Plaintiffs filed their whistleblower retaliation complaints with OSHA, and the Administrative Review Board has not issued a final decision regarding Plaintiffs' complaints.

65.     Plaintiffs are entitled to relief under 18 U.S.C. § 1514A(c)(1) and (2), including but not limited to: reinstatement with the same seniority status that Plaintiffs would have had but for the discrimination; back pay with interest; lost stock awards; and compensation for special

damages, including litigation costs, emotional distress, loss of reputation, expert witness fees and reasonable attorneys' fees.

## COUNT II – DODD-FRANK WHISTLEBLOWER RETALIATION
## AGAINST STERLING, TSC, AND SCOTT

66.     Each and every allegation contained in the foregoing paragraphs is realleged as if fully rewritten herein.

67.     In bringing this cause of action, Plaintiffs present a good faith argument seeking reversal of *Asadi v. G.E. Energy (USA), L.L.C.*, 720 F.3d 620 (5th Cir. 2013).  *See Smith v. Our Lady of the Lake Hosp., Inc.*, 960 F.2d 439, 444-45 (5th Cir. 1992).

68.      In *Asadi*, the Fifth Circuit became the first appellate court to address whether an employee who reported wrongdoing internally qualified as a whistleblower eligible for protection under Dodd-Frank.  It decided Dodd-Frank does not protect internal reporting.  Since that decision, the Second Circuit and a large number of other federal district courts have disagreed with the analysis in *Asadi*.  *See Berman v. Neo@Ogilvy LLC*, 801 F.3d 145, 153 (2d Cir. 2015); *see, e.g.*, *Yang v. Navigators Grp., Inc.*, 18 F. Supp. 3d 519, 534 (S.D.N.Y. 2014); *Connolly v. Remkes*, No. 5:14-CV-01344, 2014 WL 5473144, at *4-6 (N.D. Cal. Oct. 28, 2014); *Khazin v. TD Ameritrade Holding Corp.*, No. CIV.A. 13-4149, 2014 WL 940703, at *4-6 (D.N.J. Mar. 11, 2014); *Ellington v. Giacoumakis*, 977 F. Supp. 2d 42, 45 (D. Mass. 2013). Plaintiffs submit that the development of the case law since *Asadi* presents an opportunity for the Fifth Circuit to reverse its decision in *Asadi*.  The legal landscape has changed, particularly now that the Second Circuit has a published opinion disagreeing with *Asadi*.

69.     Furthermore, this case is factually distinguishable from *Asadi* because rather than just reporting to their supervisors the problems they discovered, Plaintiffs also refused to certify financial statements for TSC that would be rolled up into Sterling's financial statements filed with the SEC.

70.     The Plaintiffs were terminated because of a lawful act done in "making disclosures that are required or protected under the Sarbanes-Oxley Act of 2002 (15 U.S.C. § 7201 *et seq*.) . . .and any other law, rule, or regulation subject to the jurisdiction of the [SEC]." *See* 15 U.S.C. § 78u-6(h)(1)(A)(iii).

71.     The Plaintiffs had a reasonable and subjectively held belief that certifying the TSC financial statements that Sterling would rely upon to compile its own quarterly financial statements, along with TSC's books and records, violated securities laws, rules, and regulations. The Plaintiffs reasonably and subjectively believed the TSC financial statements contained misrepresentations about TSC's financials and did not comply with relevant laws, rules, and regulations.

72.     The Plaintiffs suffered adverse action because they were terminated.

73.     A causal connection exists because of the temporal relationship between the Plaintiffs' refusal to certify TSC's financial statements and the Plaintiffs' termination.  Causation can also be inferred from the circumstantial evidence that the proffered reason for the terminations was false.

74.     The Plaintiffs' protected activity was the proximate and but-for cause of their termination.  In the alternative, it was a substantial contributing cause.

## VI.   <u>ATTORNEYS' FEES</u>

75.   Each and every allegation contained in the foregoing paragraphs is realleged as if fully rewritten herein.

76.   As a result of the actions stated above, Plaintiffs were forced to employ the undersigned attorneys.

77.   As a result of Defendants' conduct, Plaintiffs are entitled to recover from Defendant their reasonable attorneys' fees for bringing this action pursuant to the applicable statutes, as well as the costs incurred in this action and any and all appeals of this action.

## VII.   <u>DAMAGES</u>

78.   Each and every allegation contained in the foregoing paragraphs is realleged as if fully rewritten herein.

79.   As a result of Defendants' violations of SOX and Dodd-Frank, Plaintiffs seek the following relief: (1) compensatory damages, including, but not limited to lost base wages, reinstatement and vestment of all stock awards made or promised to Plaintiffs, bonus payments, and lost pay increases and raises and benefits, loss of reputation, and mental and emotional distress; (2) reinstatement, if feasible and appropriate; (3) front pay in lieu of reinstatement to his former position with Defendants; (4) injunctive relief preventing these retaliatory practices by Defendants; (5) reasonable attorney fees and all costs; and (6) all other equitable and other remedies to which Plaintiffs are entitled.

80.   Also, because Defendants' actions were committed with reckless indifference to Plaintiffs' statutorily protected rights, Plaintiffs are entitled to recover exemplary damages in an

amount sufficient to deter Defendants and others similarly situated from this conduct in the future.

81.     Additionally, because Defendants' actions were committed willfully, Plaintiffs seek any additional damages allowed under the relevant statutes.

## VIII.   <u>JURY DEMAND</u>

82.     Plaintiffs request a trial by jury on all issues triable by a jury.

## IX.   <u>REQUEST FOR RELIEF</u>

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that they have judgment against Sterling, TSC, and Scott for:

1. Compensatory damages, including, but not limited to lost base wages, bonus payments, stock awards, and lost pay increases and raises and benefits, loss of reputation, and mental and emotional distress;
2. Reinstatement, if feasible and appropriate;
3. Front pay in lieu of reinstatement to their former positions with Defendants;
4. Injunctive relief preventing these retaliatory practices by Defendants;
5. Reasonable attorneys' fees and all costs;
6. Exemplary damages; and
7. All other equitable and other remedies to which Plaintiffs are entitled.

DATED: November 18, 2016        Respectfully submitted,

/s/ *Neal Sarkar*
Neal Sarkar
State Bar No. 24093106
Federal ID No. 2274036
Ahmad, Zavitsanos, Anaipakos, Alavi &
Mensing, P.C.
1221 McKinney, Suite 2500
Houston, Texas  77010
Phone: 713.655.1101
Fax: 713.655.0062
nsarkar@azalaw.com

Attorney-in-Charge for Plaintiffs Mark
Buchanan and Dale Hoover

OF COUNSEL:

John Zavitsanos
State Bar No. 2251650
Federal ID No. 9122
Ahmad, Zavitsanos, Anaipakos, Alavi &
Mensing, P.C.
1221 McKinney, Suite 2500
Houston, Texas  77010
Phone: 713.655.1101
Fax: 713.655.0062
jzavitsanos@azalaw.com